KINGMAN ST. LOUIS IMPLEMENT COMPANY, Appellant, v. SOUTHERN RAILWAY COMPANY, Respondent.

St. Louis Court of Appeals, June 23, 1908.

1. COMMON CARRIERS: Delivery. Where a consignee of several carloads of freight retained the right to inspect them when they were placed upon the switch for unloading before accepting them, a delivery upon the switch was sufficient to release the railroad company from its liability as a common carrier.

2. ———: Bailment: Pleading: Variance. Where a railroad company placed several carloads of freight upon a switch for the purpose of unloading by the consignee and subject to the consignee's right to inspect and thereby was released of its liability as a common carrier, but nevertheless afterwards

agreed with the consignee that it would take charge of the cars and put them in a place of safety to prevent them being damaged by a coming flood, a proof of such facts would not entitle the consignee to recover in an action against the railroad company for a violation of its duty as a common carrier; the company was liable, if at all, only as bailee under the agreement.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse A. McDonald,* Judge.

AFFIRMED.

*Sturdevant & Sturdevant* for appellant.

(1)  Plaintiff's action is in tort and based upon the negligence of the defendant in failing to exercise ordinary care for the protection of plaintiff's property while in its custody; and under the pleadings and evidence offered by plaintiff, the case should have gone to the jury.  Davis v. Railroad, 89 Mo. 340; Lamar Mfg. Co. v. Railroad, 117 App. 453; Pinkerton v. Railroad, 117 Mo. App. 288; Creamery Co. v. Railroad, 107 S. W. 462.  (2)  It is the duty of the common carrier not only to safely carry property to its destination, but to take it to the place, provided at that point, for delivery to consignees of property of its kind, and there place it in position of accessibility.  Grain Co. v. Railroad Co., 114 Mo. App. 488; Ratliff Bros. v. Railroad, 118 Mo. App. 644.  (3)  A carrier is liable for property received for transportation until it reaches its destination and is unloaded; and until received by the consignee it is liable either as carrier or warehouseman, which differ only in the degree of responsibility, the carrier being liable in either capacity for its negligence, and the burden of proof is on the carrier to show that its capacity has changed to that of warehouseman.  Herbert v. Railroad, 112 Mo. App. 459; Gashweiler v. Railroad, 83 Mo. 112; Bell v. Railroad, 6 Mo. App. 363.

STATEMENT.—The petition is in three counts.   In the first it is stated, in substance, that the defendant, on June 2, 1903, as a connecting carrier, received from the Big Four Railway Company, one car containing forty-three Weber wagons and sundry fixtures, all in good condition, consigned to plaintiff at East St. Louis, Illinois, and alleges that it was defendant's duty to exercise ordinary care to protect said property from damage while in its possession and to deliver same to plaintiff, the consignee, in like condition as when received; that defendant, on said second day of June, placed the car in its yards in East St. Louis, known as the Sixth street yards, which are on very low ground and subject to frequent overflow from the waters of the Mississippi river, and permitted said car to remain in said yards until June tenth; that defendant, from the second day of June to June tenth, was informed and had knowledge that its Sixth street yards were threatened with an unusual overflow and was requested by plaintiff to move said car to higher ground and to a place of safety, which defendant could have done but it negligently permitted said car to remain in its Sixth street yards and, on June tenth, while said car was in said Sixth street yards, and in the possession of defendant, it and its contents were submerged by an overflow of the Mississippi river and the wagons and other contents of the car were damaged, etc.

The second and third counts refer to the first one and are like it in all respects except the car in the second count was received by defendant from the Vandalia Railroad Company, and was loaded with barrows, lawn mowers and fixtures and repairs belonging thereto.   The car in the third count was received from the Chicago & Alton Railroad Company and was loaded with binding twine.

Defendant's answer consists of a general denial and the further allegation that the cars were received

by defendant from the connecting railroad to be switched and delivered to plaintiff at its place of business located on defendant's line of track in the city of East St. Louis; that on June fourth, defendant delivered the car to plaintiff at its place of business in East St. Louis, Illinois, and at the time of such delivery the car and goods were in good order and condition, and in the same condition as when received by defendant.

Defendant further answered that at the time alleged, and for some time prior thereto, there was a custom in general use, participated in by both plaintiff and defendant, whereby defendant delivered cars consigned to plaintiff by placing them at plaintiff's platform at its place of business, at the switch track known as 'Kingman switch,' and that defendant, in accordance with said custom, placed these cars on said switch track, thereby delivering the same in good order, etc.; that thereafter, on June sixth, after such delivery, and while the cars were standing on the Kingman switch at plaintiff's platform, plaintiff, for its own convenience and accommodation, and without any consideration therefor, requested defendant to move said car from said Kingman switch and place the same in defendant's yard, known as its Sixth street yard, and alleges that thereby plaintiff ratified and accepted the aforesaid delivery of the car and estopped itself to deny the same; that defendant, without consideration therefor, and for the accommodation of plaintiff, removed said car from said switch and placed the same in its Sixth street yard; that but for such request defendant would not have moved said car from the Kingman switch, and if any damage occurred to the property it was while same was in the Sixth street yard under the circumstances alleged. The answer to each of the three causes of action is substantially the same.

Plaintiff denied that the cars were billed in care of the Kingman switch, admitted that on June sixth the

car was placed on the Kingman switch in East St. Louis, and was at that time in good condition, denied that the car was then delivered to plaintiff or accepted by it, and denied that the custom alleged in defendant's answer was the custom followed between plaintiff and defendant in delivering cars, but alleged that in all cases, where by custom and usage cars billed to plaintiff in East St. Louis were placed upon Kingman switch at a convenient place for unloading, plaintiff had forty-eight hours in which to inspect, unload and accept the same, and had the right at all times to reject any and all cars after the same were placed upon said switch, and to give any additional and further instruction pertaining to the moving and handling of the same until received and unloaded by plaintiff, and denied that it requested the defendant to place said cars in its Sixth street yard, or that the same were ever delivered to plaintiff. The replies to the answers to the separate cause of action are substantially the same. The reply also denies all other allegations of new matter in the answers to all the counts.

A stipulation was entered into by the parties and filed in the cause, to the effect that car No. 8754 was at ten o'clock on June 4, 1903, placed on the switch track known as Kingman switch in East St. Louis, Illinois, which track runs along in front of plaintiff's warehouse; that car No. 12291, at eight o'clock on the forenoon of June 6, 1903, was similarly placed; that car No. 93060 was, on June 4, 1903, at five o'clock, similarly placed.

Edward H. Bowie, the government official, local forecaster in charge of the weather bureau at St. Louis, in June, 1903, testified that his first warning was issued on May thirty-first; that on June second he issued the following notice:

"Mississippi is at or above the danger line at all

points in the St. Louis district.    The rise will continue rapidly."

· That on the following day he issued the following notice:

"St. Louis.    Rate of rise will continue rapidly; 22 1-2 ft. will be reached Friday morning, 34 1-2 Saturday morning, stage of 35 ft. Sunday night or Monday.   Measures to protect property for 36 ft. stage Monday should be taken."

On the next day, the fourth, he issued the following:

"St. Louis.    During last 24 hours Mississippi rose 1-4 ft. to ·stage 33 1-2, stage 35 ft. St. Louis will be reached by Saturday noon, 36 ft. Sunday night, and stage 37 to 37 1-2 ft. by Tuesday.   Measures to protect property at stage of 37 1-2 ft. at St. Louis should be taken."

The day following, the fifth, he issued the following statement:

"St. Louis.    Rise will continue rapidly through the next forty-eight hours, stage 37 1-2 ft. Monday or Tuesday night being reached.    Measures to protect property at stage of 37 1-2 to 38 ft. should be taken."

Witness testified that the following day he sent out practically the same report; that he published reports on the daily weather map issued from the office, twelve hundred copies of which were circulated in St. Louis and vicinity; that his reports were published in all the daily papers of St. Louis and East St. Louis; that his duties were to forecast the weather for St. Louis district, St. Louis and vicinity, to send out warnings and the forecast of rivers of St. Louis district.

The following stipulation of facts was entered into by the parties and read in evidence:

"That defendant Southern Railway Company received from the C. C. C. and St. L. Railway Company at Brooklyn Station, in East St. Louis, Illinois, on

June second, 1903, at 5:55 o'clock in the afternoon, St. Louis and San Francisco car No. 8754, consigned to the plaintiff at the City of East St. Louis, Illinois; and that said defendant thereafter and at ten o'clock in the forenoon of June 4, 1903, placed the said car upon the plaintiff's track, known as Kingman switch, in East St. Louis, Illinois, which said track runs along in front of plaintiff's warehouse.

"That the defendant Southern Railway Company received from the Chicago & Alton Railway Company, at Brooklyn Station, in East St. Louis, Illinois, on June 3, 1903, at 7:20 o'clock in the afternoon, Missouri Pacific car No. 12,291, consigned to the plaintiff at the City of East St. Louis, Illinois; and that said defendant thereafter and at 8 o'clock in the forenoon of June 6, 1903, placed said car upon switch track known as Kingman switch, in East St. Louis, Illinois, which said track runs along plaintiff's warehouse.

"That the defendant Southern Railway Company, received from the Pennsylvania Railway Company at Willows Station, in East St. Louis, Illinois, on June 4, 1903, at 5 o'clock in the afternoon, Pennsylvania car No. 93,060, consigned to plaintiff at the city of East St. Louis, Illinois, and that said defendant thereafter on the sixth day of June, 1903, early in the forenoon, placed said car upon the switch track known as Kingman switch, in East St. Louis, Illinois, which said track runs along in front of plaintiff's warehouse."

"Kingman switch," spoken of in the stipulation, is about one thousand feet long. Plaintiff's platform is toward the west end of the switch and is about 276 feet long. The east end of the switch is about six hundred feet from the platform. Commercial firms other than plaintiff used this switch, which had no connection with any other line of railroad except defendant's to receive and send out freight. In regard to the delivery of cars on the switch by defendant, H.

P. Farr, who was assistant manager for plaintiff, in June, 1903, testified as follows:

"If there was sufficient room at the loading platform the railway company usually placed the cars for unloading, removing the same after unloading was completed. But if, as was quite often the case, the track along the platform was already full of cars, they would set the loaded cars on the east end of the Kingman switch, placing the same at the platform as soon as cars could be taken out, which had been either unloaded or loaded by the Kingman people. If the car was set at the platform at once, the Kingman people were privileged to have forty-eight hours in which to unload the same without the demurrage commencing. If, however, the car was set at the east end of the track or switch on account of the Kingman people not being able to take care of the same promptly, the forty-eight hours commenced at the time the car was set on the east end of the track, and if the Kingman people did not get the car unloaded within forty-eight hours from the time of placing on the east end of the track, they then had to pay demurrage for any additional time required to unload it."

Witness testified that this custom had been in existence certainly as far back as 1900.

R. M. Slater, who was local freight agent at East St. Louis, in June, 1903, testified that defendant merely acted as a switching line for plaintiff and delivered cars to it by simply switching them on the Kingman switch, which was taken as delivery and that it was not necessary to place a car at plaintiff's platform to make delivery of it; that he knew nothing of a delivery subject to acceptance, in any case, and never received any notice of the rejection of these cars; that after the cars were placed on the switch the railroad company had nothing further to do with them, nor control over them, and that for all movements after cars were

placed on the switch, the railroad company made an extra charge.

Plaintiff's evidence tends to show that the custom was to place cars billed to plaintiff in front of its platform but if there was not sufficient room they would be placed on the east end of the switch and as soon as the track was cleared and room made they would be set at the platform by defendant.

L. Wolfmeyer, one of plaintiff's employees, stated that he had a conversation with Mr. Campbell (an employee of defendant) in regard to moving the property, on the morning of June third. Mr. Campbell said he did not think the water would reach St. Louis. Witness told him that Mr. Burns, the manager, had instructed him to arrange for the moving of the cars over to the bluffs, or if necessary, to Belleville, out of the reach of the water, and that Mr. Campbell agreed to keep the property out of the reach of the water; that his final instructions were to take them to the bluffs or Belleville; that he was informed at Mr. Campbell's office that the way was open at the time he made the request, there being no obstruction on the track east of east St. Louis. This witness stated that he understood the three cars were on the Kingman switch at the time he called on Mr. Campbell, therefore, he is mistaken as to the date he made said call and must have called not earlier than June sixth, as the agreed statement of facts states that all the cars were not placed on the Kingman switch until June sixth.

W. J. Crockett, assistant city engineer of the city of East St. Louis, testified that the city was protected all around by railroad embankments, with dykes along the front or western part which effectually protected the city from the overflow of 1892 and 1897; that at the approach of the flood of 1903, the city authorities knowing where the weak points were, took measures to strengthen the protection against the approaching wa-

ter and elevated the railroad embankments; that the people of the city were not alarmed by the reports sent out by the weather bureau, and that he thought the city would be safe from damage by the flood and felt secure until the morning of June ninth, when the water broke through the Illinois Central embankment in the southern part of the city. Witness described this embankment as being high and very strong, carrying three railroad tracks; that it had withstood all previous floods and had never broken or given cause for alarm, and was relied on to protect the city from the water coming from the south; that its weakness did not develop until on the morning of the ninth when it broke; that the flood of 1903 was the greatest in the history of the city for the last half century, came the quickest, rose the fastest and did the greatest amount of damage; that on the breaking of the embankment, all the southern part of the city was flooded, including defendant's Sixth street yards.

Plaintiff's evidence proved the three cars were submerged and their contents damaged by the water. At the close of plaintiff's evidence, the court gave an instruction in the nature of a demurrer to the evidence on all the counts of the petition, whereupon plaintiff took a nonsuit with leave to move to set the same aside. Its motion to set aside the nonsuit was overruled and the appeal was thereafter duly taken and perfected.

BLAND, P. J.—Defendant contends that the nonsuit was proper for the reason the evidence shows the three cars were delivered to plaintiff June sixth, on the Kingman switch, in good condition, and hence were not in defendant's possession as connecting carrier, on June ninth, when they were submerged, as alleged in the petition. Plaintiff's evidence tends to show that it had the right to inspect the cars after they were placed on the switch before accepting them. This right does not

militate against defendant's contention, that a delivery on the switch was a sufficient delivery to release it from liability as a common carrier as to said cars, for a delivery subject to the right of inspection placed them under the dominion of plaintiff, and defendant had no right to interfere with that dominion, unless on inspection, plaintiff rejected the cars and notified defendant of its rejection. This was not done, and we hold that the evidence proves all the cars had been delivered to plaintiff by defendant, as connecting carrier, in good condition, and that defendant's liability as a common carrier ceased before the contents of the cars were damaged by the flood.

Plaintiff's evidence tends to show that on or about the day the last car was delivered on the Kingman switch, plaintiff communicated to defendant its fear that the cars were in danger from the fast approaching flood, and requested defendant to move them to higher ground; that defendant promised and agreed to move them to a place beyond the reach of the flood and could have done so by the exercise of ordinary diligence, but instead negligently moved them to its Sixth street yards, where they were more exposed to the flood than they would have been had they been left on the Kingman switch. Wolfmeyer's testimony is that the agreement finally reached was that defendant would haul these cars beyond reach of the water, agreeing to do so without any profit to its company, except that plaintiff should reimburse the Southern Railway Company for any actual expense it might be put to in handling the cars to keep them out of the water, this expense, if any, to cover the service and the charge of the railway company for the use of the cars, but it would make no charge for the switching. This evidence shows that defendant took charge of the cars not as a carrier but at bailee, under an agreement to remove them to a place of safety. It did not perform this agreement and, if liable at all,

is liable for a breach of the contract to move the cars to higher ground out of reach of the flood.     But the action is not brought for a breach of defendant's obligations as a bailee, to protect the cars from the flood. The cause of action pleaded in each count of the petition is to recover damages for a breach of defendant's duty as a common carrier, to exercise ordinary care to protect plaintiff's goods from injury by the flood,— an altogether different cause of action from the one which plaintiff's evidence tended to prove.     That a plaintiff cannot sue on one cause of action and recover upon another is too well settled to require the citation of authorities in its support.

The judgment is affirmed.     All concur.